CIRCUIT COURT OF WASHINGTON COUNTY, FOURTH JUDICIAL DISTRICT

LAKISHA ROCHELLE GRIFFIN a/k/a

LAKISHA ROCHELLE GRIFFIN SORRELS                                    PLAINTIFF

V.                                                    CIVIL ACTION NO: 2014-0063 CI

HSBC MORTGAGE SERVICES INC., HSBC FINANCE
CORPORATION, AMERICAN SECURITY INSURANCE CO.,
ASSURANT, INC., LSI REAL ESTATE TAX, CORELOGIC
SERVICES, CORESTAR FINANCIAL GROUP, LLC
and/or its successors and assigns, MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC. and/or MERSCORP HOLDINGS, INC.,
JOHN DOES Affiliates of Corestar Financial Group 1-5,
JOHN DOE Insurance Defendants 6-10,,
JOHN DOE Services, Fees and Charges Defendants 16-20,
HSBC JOHN DOES 21-25, OTHER John Does 26-30,
CALIBER HOME LOANS, INC.,
AMERIPRISE INSURANCE COMPANY,
IDS PROPERTY CASUALTY INSURANCE COMPANY, and
TRUCK INSURANCE EXCHANGE                                            DEFENDANTS.

Received & Filed

JUL 3 1 2014

Barbara Esters-Parker

By: _____ D.C.

## SECOND AMENDED COMPLAINT

### Jury Trial Requested

Lakisha Rochelle Griffin, through her undersigned counsel, files this Second Amended

Complaint and would show this Honorable Court the following:

### PARTIES

1.   LAKISHA ROCHELLE GRIFFIN, formerly known as Lakisha Rochelle Griffin

Sorrels, is an adult resident of Washington County, Mississippi and the owner of a certain piece

of real property located at 1725 McClain St., Greenville, Mississippi.

2.   HSBC MORTGAGE SERVICES INC., upon information and belief is a business

corporation incorporated in either the State of Ohio or the State of Delaware, doing business in

the State of Mississippi, who may be served through its registered agent for service of process,

C T Corporation System, 645 Lakeland East Drive, Suite 101, Flowood Ms 39232.  Upon

information and belief, it is a wholly owned subsidiary of HSBC FINANCE CORPORATION.

3. HSBC FINANCE CORPORATION, upon information and belief is a consumer finance company incorporated in the State of Delaware, which provides financing, insurance, and various other services to its subsidiaries which deal directly with consumers and borrowers. Upon information and belief, it can be served at its principal executive offices located at 26525 North Riverwoods Blvd., Suite 100, Mettawa, IL 60045.

4. "HSBC Group", upon information and belief, is a business name used to refer to HSBC Holdings, plc and its various subsidiaries and affiliates and their subsidiaries and affiliates, including HSBC Finance Corp. and HSBC Mortgage Services Inc.

5. AMERICAN SECURITY INSURANCE CO. is, upon information and belief, an insurance company incorporated in the State of Delaware, licensed to and doing business in the State of Mississippi, which primarily provides lender placed insurance to the mortgage industry and mortgage servicing industry. It may be served through its agent for service of process, United States Corporation Company 506 South President Street, Jackson, MS 39201. Upon information and belief, it is a wholly owned subsidiary of Assurant, Inc.

6. ASSURANT, INC., upon information and belief is a Delaware corporation, which provides specialized insurance and related services throughout the United States including debt protection administration and lender-placed homeowners insurance products and services to major lenders such as members of the HSBC Group. Upon information and belief, it can be served at its principal executive offices located at One Chase Manhattan Plaza, 41st Floor, New York, New York, 10005.

7. JOHN DOE Insurance Defendants 6-10 are entities, the identity of which are presently unknown, who did, or should have, provided insurance related services (including but not limited

to escrow, tracking, placement, billing, and provision of information to the borrower) or who benefited from the placement of insurance in connection with the loan and deed of trust identified as MERS MIN 100257405873395254 and the associated promissory note.

8. CORESTAR FINANCIAL GROUP, LLC, hereinafter "Corestar", upon information and belief, is or was a limited liability company formed in Maryland, which was registered to do business in the State of Mississippi in 2006. Its last registered agent for service of process was National Registered Agents Inc, 840 Trustmark Bldg 248 E Capitol St, Jackson Ms 39201, however, it was administratively dissolved by the Mississippi Secretary of State on December 5, 2011 for failure to file current annual reports. Upon information and belief, it is or was a mortgage banking producer focused on originating consumer debt consolidation loans secured by residential real estate mortgages throughout the United States financed by leading lenders including the HSBC Group.

9. JOHN DOE Affiliates of Corestar Financial Group 1-5 are entities, the identity of which are presently unknown who are successors or assigns of Corestar's interest in the loan and deed of trust identified as MERS MIN 100257405873395254 and the associated promissory note; who performed services for Corestar in connection with that loan, deed of trust or note; who have succeeded to Corestar's duties and liabilities in connection with that loan, deed of trust, or note; or who assumed the position or rights of, or performed or assumed the duties of, or otherwise stood in the place of, the "Lender" or creditor in connection with that loan, deed of trust or note.

10. JOHN DOE Services, Fees and Charges Defendants 16-20 are entities, the identity of which are presently unknown who did, or should have, provided services related to fees and charges assessed, charged or posted to the accounts for the loan and deed of trust identified as

MERS MIN 100257405873395254 and the associated promissory note (including but not limited to escrow, tracking, billing, financing of fees and charges, defaults, restructuring, miscellaneous fees and provision of information to the borrower) or who benefited from such activity.

11. LSI REAL ESTATE TAX, upon information and belief, is or was a business entity whose last known address for its principal offices was 3100 New York Drive, Suite 100, Pasadena, CA 91107, which did business in the State of Mississippi in 2006 and 2007. Upon information and belief, it provided property tax data procurement and disbursement services; property tax delinquency, monitoring and tracking services; escrow reporting services; and outsourcing services, such as delinquency notification and tracking, and tax payment processing to members of the lending industry including members of HSBC Group.

12. CORELOGIC SERVICES upon information and belief, is a Delaware business entity doing business in the State of Mississippi, which provides property tax services to the residential mortgage servicing industry, including HSBC Mortgage Services, Inc. Upon information and belief, it may be served through its agent for service of process, Corporation Service Company, Office Address: 506 South President Street, Jackson, MS 39201-5301.

13. MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. and MERSCORP HOLDINGS, INC., collectively referred to herein as MERS®, are upon information and belief Delaware corporations, with Mortgage Electronic Registration Systems, Inc. being a wholly owned subsidiary of Merscorp Holdings, Inc. MERSCORP Holdings, Inc. is a privately held member-based organization made up of lenders, servicers, sub-servicers, and investors in the mortgage industry including many of the defendants in this case. It owns and manages the MERS® System and all other MERS® products. Mortgage Electronic Registration Systems, Inc. (MERS) serves as the mortgagee in the land records for loans registered on the MERS®

System, and is a nominee (or agent) for the owner of the promissory note. The MERS® System is a national electronic database that tracks changes in mortgage servicing and beneficial ownership interests in residential mortgage loans. Mortgage Electronic Registration Systems, Inc. and Merscorp Holdings, Inc. can be served at their corporate headquarters located at 1818 Library Street, Suite 300, Reston, VA 20190 between the hours of 10:00 AM and 1:00 PM local time. Upon information and belief, HSBC Group is a founding financial contributor to MERS® through HSBC Finance Corporation, a founding shareholder, and HSBC Mortgage Services, Inc. is a major user of MERS® services. MERS is made a defendant solely for purposes of being bound by the action for an accounting set forth in Count VIII and the action for cancellation or invalidation of mortgage set forth in Count IX.

14. HSBC JOHN DOES 21-25, are entities who are part of, or affiliates of HSBC Group, whose specific identity are presently unknown, who benefited from, participated in, or contributed in some manner to the practices complained of in this suit.

15. OTHER John Does 26-30 are entities, the identity of which are presently unknown, who are associated with the origination, servicing, and security for the loan and deed of trust identified as MERS MIN 100257405873395254 and the associated note.

16. CALIBER HOME LOANS, INC. is upon information and belief, a mortgage servicing company incorporated in the State of Delaware, with its principal office in the State of Texas, licensed to and doing business in the State of Mississippi. It may be served through its agent for service of process, C T CORPORATION SYSTEM, 645 Lakeland East Drive, Suite 101, Flowood, MS 39232. Upon information and belief, it received an assignment from HSBC Mortgage Services of the lender's servicing rights and obligations on the loan and deed of trust identified as MERS MIN 100257405873395254 and the associated note sometime around

August or September of 2013. CALIBER HOME LOANS INC. is made a defendant solely for purposes of being bound by the action for an accounting set forth in Count VIII and the action for cancellation or invalidation of mortgage set forth in Count IX.

17. AMERIPRISE INSURANCE COMPANY is an insurance company which upon information and belief had a hazard policy in effect insuring Lakisha Griffin's property on April 27, 2013. Upon information and belief, Ameriprise Insurance Company is a Wisconsin based insurance company who may be served through its registered agent, CT Corporation System of Mississippi, 645 Lakeland East Drive, Suite 101, Flowood, MS 39232.

18. IDS PROPERTY CASUALTY INSURANCE COMPANY is an insurance company which upon information and belief had a hazard policy in effect insuring Lakisha Griffin's property on April 27, 2013. Upon information and belief, IDS Property Casualty Insurance Company is a Wisconsin based insurance company who may be served through its registered agent, CT Corporation System of Mississippi, 645 Lakeland East Drive, Suite 101, Flowood, MS 39232.

19. TRUCK INSURANCE EXCHANGE is an insurance company which upon information and belief had a hazard policy in effect insuring Lakisha Griffin's property on April 27, 2013. Upon information and belief, Truck Insurance Exchange is a California based insurance company who may be served through its registered agent, United States Corporation Company, 506 South President Street, Jackson, MS 39201.

### JURISDICTION AND VENUE

20. This court has jurisdiction over the matters asserted in this suit pursuant to Miss. Code § 9-7-81.

21. This court has personal jurisdiction over all the parties to this action pursuant to the

provisions of Title 13, Chapter 3 of the Mississippi Code and the Mississippi and U.S. Constitutions.

    **22.** Washington County is a proper venue pursuant to Miss. Code § 11-11-3.

**FACTS**

    23.  In the early months of 2006, Plaintiff, Lakisha Griffin Griffin Sorrels had several debts and regular expenses that had become difficult for her to manage separately including a first mortgage on her home, a second mortgage on her home, annual property tax bills, an annual premium for hazard insurance, and an annual premium for flood insurance. In order to make these expenses more manageable, she sought out a debt consolidation loan which would cover the debt on her home, her property taxes, her hazard insurance, and her flood insurance with one predictable monthly payment to a single entity.

    24. Like most homeowners in need of a debt consolidation loan, Lakisha Griffin did not understand the intricacies of the subprime mortgage lending industry and all the various entities that can play a role in the origination, funding, servicing, collection and enforcement of such mortgages. It appeared to her as if she was and would be dealing with a single entity .

    25.  However, the deed of trust shows that several other entities were involved. It named the "Lender" as Corestar Financial Group, LLC and was stamped with a notice to return it to CFS Settlements, LLC. It named Mortgage Electronic Registration Systems, Inc. as nominee for the Lender or its assigns and as beneficiary of the deed of trust. Lakisha Griffin never heard from most of these entities again. As far as her interactions were concerned, it appeared as if only HSBC was involved with her mortgage until August of 2013.

    26.  Upon information and belief, however, HSBC employed a number of different service providers to perform or exercise various parts of the lender's duties, obligations and rights as well as its duties, obligations and rights as the loan servicer. These entities included,

but were not limited to:

    a.  American Security Insurance Company and/or Assurant, Inc. and/or the John Doe Insurance Defendants to keep track of the status of insurance on the property and/or to force place flood and hazard insurance upon the occurrence, or appearance of the occurrence, of certain trigger events or the passage of certain trigger dates which were not restricted to an actual cancellation, expiration, or lapse of insurance coverage on the property;

    b.  LSI Real Estate Tax, Corelogic Services and/or the John Doe Property Tax Defendants to keep track of the status of property taxes on the property, and/or to wait until the property was sold for delinquent taxes and then to redeem the property and assess the inflated redemption charges against the loan account; and

    c.  the John Doe Services, Fees and Charges Defendants whose action or inaction resulted in the assessment of other unexplained charges, interest and/or deferred interest assessments against the loan account.

27. At the time she sought out this loan, Lakisha Griffin had regularly kept up both a FEMA flood insurance policy and hazard insurance on her home through her local State Farm agent since she had purchased the home in 2002. Her FEMA flood policy was effective through October 7, 2006. In connection with obtaining this loan, around February 23, 2006, Lakisha Griffin visited her State Farm agent and paid the additional premium to increase her flood insurance coverage to $160,600 through the next renewal date of October 7, 2006. In connection with obtaining this loan, Lakisha Griffin provided the people with whom she was working with the information on her existing flood and hazard insurance and her insurance company and agent of choice.

28. At the time she sought out this loan, Lakisha Griffin was behind on her property taxes. A primary purpose for refinancing and consolidating her debts was to get caught up on her taxes and have them handled through a mortgage escrow account to reduce the costs, spread tax costs out over the year, ensure her taxes were paid on time, and avoid the increased costs of getting behind on her taxes in the future. Another primary purpose was to have a mortgage escrow account funded by the monthly mortgage payment cover the annual premiums for her flood and hazard insurance to spread out the insurance costs over the year and also to assure money would be available when those bills came due and that they were promptly paid each year.

29. In the process of obtaining and closing the loan, Lakisha Griffin paid the amount needed to redeem her property from the tax sale for delinquent 2004 taxes. She believed she had paid what was necessary to get caught up on her property taxes. She relied on the representations of the loan originator she was working with, believed to be Janette Rubino, to make sure the loan was set up with escrow services so funds would be available at the proper times to pay her property taxes and to make sure the taxes would in fact be paid on time in the future. She also relied upon the representations of the loan originator she was working with to make sure the loan was set up with escrow services so her FEMA flood insurance policy and State Farm hazard insurance policies would be renewed at the proper time each year and the funds would be available and would be timely paid to renew these policies each year.

30. This loan was negotiated and closed through a combination of phone calls, email, and Internet communications. The lender never had a representative meet in person with Lakisha Griffin and explain the documents it presented to her and required her to sign.

31. When working out the closing for this loan, the loan originator Lakisha Griffin was

working with assured her that her monthly mortgage payment would include principal and interest and the monthly escrow for her property taxes and her State Farm hazard and State Farm/FEMA flood insurance.

32. The Deed of Trust appeared to reinforce the representations made to Lakisha Griffin concerning the escrow of funds to pay taxes and hazard and flood insurance as it said taxes and flood and hazard insurance were escrow items.

33. The good faith estimate reinforced the representation that an escrow account would be set up for taxes and insurance, that funds designated for taxes and insurance would be paid at closing, and that part of the monthly payment would be for escrow reserves to pay her annual tax and insurance bills.

34. The closing settlement statement also appeared to reinforce these representations as it provided for advance premium payments for State Farm hazard and flood insurance on Lakisha Griffin's side of the settlement statement.

35. Although Corestar charged a separate document preparation fee in addition to its other substantial fees in connection with this loan, the package of documents it provided for closing was clearly not tailored for the particular agreements made for this refinancing transaction. It was riddled with errors and inconsistencies including but not limited to:

  a. It was clearly a package of forms designed primarily for a transaction involving the purchase of real estate by a married couple rather than a refinancing transaction by a divorced single person, but changes and corrections needed for a refinancing transaction and a divorced single person were not made and forms irrelevant to and inconsistent with the agreements for this transaction were not deleted even though the instructions emphatically insisted the borrower must sign all forms in the package

without any changes;

b. Many of the forms contained blanks that were required to be filled out but were not filled out with the proper information for this refinancing transaction, but the instructions emphatically prohibited the borrower from filling out anything other than the signature and notary blocks;

c. The identity affidavit was not filled out with the proper information identifying Lakisha Griffin and was not signed by the settlement agent;

d. In the middle of the packet there was a Patriot Act Disclosure form with instructions. The instructions required the Settlement Agent (CFS Settlements) to obtain the necessary information and documents to complete the Patriot Act forms and confirm the borrower's identity prior to having the borrower execute any other documents in the package and not to proceed with the closing if there were any discrepancies. The only information filled out on the Disclosure Form is the Customer's name - Lakisha Rochelle Griffin Sorrels. None of the information from the required documents is filled out and no one signed the form for CFS Settlements. Yet clearly CFS Settlements proceeded with sending the closing documents to her and having her execute the documents prior to completion of the Patriot Act Disclosure Form;

e. The borrower was instructed to sign an acknowledgment that the funds had been properly dispersed in full even though the instructions made clear that no funds would be dispersed until at least the day after settlement;

f. The borrower was required to sign an acknowledgment of receipt of certain title insurance information when the information the borrower was to be notified of was left blank making the notice useless;

g. The refinancing affidavit included for the title insurance required Lakisha Griffin to swear that she was still married to the other person named on the last deed of record even though she had provided information with her drivers license that she had been divorced since her last driver's license was issued;

h. The packet included a continuous marriage affidavit which Lakisha Griffin was required to sign even though she was divorced;

i. Affidavits concerning payoff of prior mortgages were not filled out with the lender and loan information;

j. The mortgage on a piece of property and a borrower located in Mississippi contained an acknowledgment for execution in Maryland;

k. Some documents in the package had acknowledgments saying they were executed in Mississippi while others said they were executed in Maryland, and the county where acknowledgments were executed was usually not filled out;

l. The occupancy affidavit notified the borrower the Lender intended to assign the loan and the Loan Servicing Notice said the loan would be assigned effective with the date of the first payment, but the Notice did not name the intended assignee servicer or provide its address and phone number as required by law. However, the notice to first lien mortgage loan applicants stated that Corestar had not decided whether it would assign this loan even though it assigned most of the loans it originated.

m. The package erroneously included a conditional waiver of escrow funds even though no waiver of escrow had been requested and in fact, the borrower had specifically requested escrow of insurance and taxes and had been told repeatedly that the monthly mortgage payment would include escrow funds for taxes and insurance.

36. Despite all these problems and the fact that the package included at least one form which expressly stated it was not to be signed until three days after closing, the Lender's agent, CFS Settlements, emphatically instructed the borrower that "all documents [in the package] must be signed" and not to make any alternations to the documents "under any circumstances." Furthermore, Lakisha Griffin, as borrower was required to sign these documents without anyone reviewing and signing the documents on behalf of the Lender to make sure the right documents were included and that the blanks in the documents were filled out properly for the agreements on this loan.

37. Lakisha Griffin was not given a reasonable opportunity to review the forms with all applicable blanks filled out before she was required to sign them.

38. No one explained the purpose of each form to Lakisha Griffin and what it was to accomplish.

39. No one explained to Lakisha Griffin that despite what she had been repeatedly told about an escrow account for taxes and insurance, the proper information was not in the package to have an escrow account set up for taxes and insurance, the amounts paid for taxes and insurance at closing were not for the purpose of initially funding an escrow account, and that the package included a form that would likely result in eliminating the effect of the escrow language in the mortgage deed.

40. Lakisha Griffin was not provided with a copy of the closing documents with signatures in all the places where the Lender or Settlement Agent should have signed the documents.

41. When it came time for renewal of her flood and hazard insurance and for payment of her taxes, Lakisha Griffin relied upon the representations made to her when she applied for the

loan. She believed HSBC had established and funded an escrow account for her loan as represented, and that it would timely pay these crucial bills. Relying on the Lender, she took no independent action to pay these bills. After all, a major reason for applying for this loan refinancing her home  was so she would not have to deal with these large annual bills. Her mortgage servicer was supposed to take care of paying these bills in a timely manner for her.

42. What followed was a nightmare array of completely incomprehensible statements, letters, and notices from several different entities which were at times contradictory and never fully informed Lakisha Griffin of how HSBC was applying her payments, what fees and charges in addition to the monthly mortgage payment were being assessed against her account and when and why,  when interest was charged on what amounts and at what rates, or the status of her taxes and insurance.

43. At least two letters Lakisha Griffin received from HSBC Mortgage Services which were supposed to itemize the charges which caused her loan to be in default showed the amount due for taxes and insurance to be zero. Another letter concerning insurance told her that an insurance renewal would be charged to her "escrow account." In reality, HSBC had never even set up an escrow account for her taxes and insurance and the fees listed as contributing to the noticed default were primarily for taxes and insurance.

44. HSBC did not timely pay Lakisha Griffin's property taxes. Instead, it repeatedly allowed her property taxes to become delinquent, allowed penalties to accrue, allowed the property to be sold at tax sale, and then redeemed the property at inflated amounts in time to protect its interests, and charged these increased amounts as additional fees and charges against the loan, all without timely notices or notices which explained what was occurring so Lakisha Griffin could prevent it from continuing to occur.

45. Upon information and belief, HSBC and/or LSI Real Estate Tax and/or Corelogic Services and/or the John Doe Tax Defendants, acting either knowingly or with reckless disregard for property owners' rights, either benefited or intended to reap benefits from these tax practices to the detriment of property owner borrowers, including Lakisha Griffin.

46. HSBC was also not escrowing funds for insurance or paying Lakisha Griffin's insurance renewals despite correspondence which appeared to indicate it was paying insurance from escrow. A letter from HSBC informed Lakisha Griffin that flood insurance was required by her mortgage. It then stated that HSBC had renewed her flood coverage in October and "charged the premium to your escrow account." October was the month when her State Farm/FEMA flood policy had renewed each year before she refinanced her house with the HSBC loan. The letter did not say what company the insurance was renewed with or state the amount of the premium. Unbeknownst to Lakisha Griffin, HSBC never set up an escrow account for taxes and insurance. The insurance referred to in the letter was force placed flood insurance assessed against her account as an added charge in addition to the monthly mortgage payment even though she already had a FEMA flood policy.

47. Instead of establishing the escrow account and renewing the State Farm/FEMA flood insurance Lakisha Griffin had obtained or sending her a reminder that she needed to renew her State Farm/FEMA flood insurance, HSBC force placed non FEMA flood insurance at four to five times the FEMA rate every year from 2006 through 2012. From at least 2008, it force placed this additional expensive flood insurance even though Lakisha Griffin was paying the premium to keep her State Farm/ FEMA policy in force and HSBC knew she had a FEMA flood policy in place through State Farm. In 2009 HSBC even force placed the annual flood insurance premium two and half months early, resulting in overlapping charges for duplicate force placed flood

coverage in addition to the State Farm/FEMA policy Lakisha Griffin chose, maintained and paid for independently of her mortgage once she realized HSBC was not renewing it and paying it from an escrow account.

48. By 2008, Lakisha Griffin had figured out that HSBC was not reliably and timely paying her FEMA flood insurance, so she went to State Farm herself and paid for it, naming HSBC as the mortgagee as required by the mortgage deed of trust and instructing her agent to send proof of coverage to HSBC.

49. HSBC was aware that Lakisha Griffin had procured FEMA flood insurance through State Farm by 2008 because the property sustained flood damage on September 3, 2008. Lakisha Griffin had named HSBC as the mortgagee on the policy, so when State Farm issued a check for repairs, it was made payable to Lakisha Griffin Sorrels and HSBC Mortgage. Lakisha Griffin was required to endorse the State Farm check over to HSBC who then required Lakisha Griffin to comply with its loss draft procedures to obtain funds to pay the repair contractor.

50. Lakisha Griffin continued to pay her own State Farm/FEMA flood premiums to make sure they got paid.

51. On October 17, 2012, her property sustained flood damage again. Again, because Lakisha Griffin had followed HSBC's requirements and named it as mortgagee on the policy, when State Farm issued a check for repairs, it was made payable to Lakisha Griffin Sorrels and HSBC Mortgage. Lakisha Griffin was required to endorse the State Farm check over to HSBC who then required Lakisha Griffin to comply with its loss draft procedures to obtain funds to pay the repair contractor.

52. Upon information and belief, HSBC may have farmed out the monitoring of flood insurance, the procurement of force placed insurance, and the assessment of insurance and

related charges against her account to another defendant, most likely Assurant or American Security Insurance.

53. Upon information and belief, HSBC repeatedly failed to send the information on Lakisha Griffin's FEMA flood insurance to the defendants to whom it had farmed out the task of tracking flood insurance coverage and force placing flood insurance, or HSBC sent the information and the defendant to whom the information was sent repeatedly failed to properly code her account so that expensive duplicate flood insurance would not be force placed and charged against her account.

54. Additionally, HSBC and the defendants to whom it farmed out its insurance functions repeatedly failed to provide Lakisha Griffin with sufficient clearly understandable information about

   a.  whether and when HSBC was paying for the FEMA flood insurance Lakisha Griffin applied for and obtained for herself;

   b.  whether HSBC and the insurance defendants were properly recording and giving Lakisha Griffin credit for the FEMA flood insurance she applied for and obtained for herself naming HSBC as mortgagee;

   c.  whether and when HSBC and the insurance defendants force placed flood insurance on her property,

   d.  what the coverage dates of forced placed flood insurance were,

   e.  what the annual premium for forced placed flood insurance was and how and when that premium was charged to her account,

   f.  what the monthly payment for the premium was and when and how it was due

   g.  how the premium for force placed flood insurance would affect the application of her

payments to various amounts due under the loan, and bringing her loan current,

h. how to obtain credit for wrongful flood insurance charges when she had her own flood insurance,

i. whether and when HSBC and the insurance defendants canceled force placed flood coverage when they knew or should have known Lakisha Griffin had FEMA flood insurance on her property,

j. whether, when, and how much HSBC and the insurance defendants credited her account for force placed insurance which should not have been charged to her account in the first place,

k. what the remaining balance assessed against her account for flood insurance and related fees was each month and

l. other information that would have made clear to her what was going on in her account in regard to force placed flood insurance.

55. By 2009, Lakisha Griffin had figured out that HSBC had not been reliably and timely paying her State Farm hazard insurance renewals when they came due, either. By that point, her State Farm policy had lapsed and she had to obtain coverage from another insurer. She obtained and paid for a hazard policy effective from April 13, 2009 through April 13, 2010 from Travelers, naming HSBC as a mortgagee.

56. HSBC was notified that Lakisha Griffin had obtained the hazard insurance from Travelers. However, HSBC and the insurance defendants failed to cancel the force placed hazard insurance which had been placed on Lakisha Griffin's property on or about July 9, 2008 and for which Lakisha Griffin's loan account had been charged for a full year premium.

57. On May 12, 2009, Lakisha Griffin's home was damaged by fire. She promptly

reported the loss and filed a claim and proof of loss. On or about June 3, 2009, Travelers issued check 883H 12178199 for $29,694.16 made out jointly to Lakisha Griffin and HSBC Mortgage. Lakisha Griffin was required to endorse the Travelers check over to HSBC who then required Lakisha Griffin to comply with its loss draft procedures to obtain funds to pay the repair contractor.

58. Although HSBC knew of the loss and the coverage and payment by Travelers and benefited from the Travelers insurance and also knew the one year hazard insurance it had procured and charged to Lakisha Griffin's loan account in July 2008 had not been canceled, HSBC did not file a claim under the policy it had placed or inform Lakisha Griffin that the coverage was still in force and that she could make a claim under it. The result was that the Traveler's policy obtained and paid for by Lakisha Griffin bore the full brunt of the loss and no benefit at all was obtained from the policy HSBC force placed and charged against her loan account.

59. Although HSBC knew from both the notice given to it when Lakisha Griffin obtained the Traveler's policy and from the Traveler's claim checks written to it and Lakisha Griffin that Lakisha Griffin had procured hazard insurance of her own choice which provided coverage to HSBC through April 13, 2010, on or about May 21, 2009, HSBC again force placed hazard insurance on her property and charged the premium to Lakisha Griffin's loan account. Since HSBC had not canceled the hazard policy it charged against the account on July 9, 2008, it force placed a new annual hazard policy on her property a full six weeks prior to the end of the policy year for the previous hazard policy it had force placed, creating a six week period in which it charged duplicate hazard insurance to her account at a time when it knew it should not have force placed any hazard insurance as Lakisha Griffin had her own hazard policy in effect

naming HSBC as mortgagee.

60. In subsequent years, Lakisha Griffin continued to obtain and pay her own hazard insurance policies, always naming HSBC as a mortgagee.

61. Each time Lakisha Griffin obtained flood or hazard insurance on her own, the agencies she used provided HSBC with evidence of coverage.

62. Although Lakisha Griffin had chosen the insurance she wanted for her property and the mortgage stated that insurance on the property "shall be chosen by Borrower," HSBC consistently force placed hazard and flood insurance with an insurer of its choice which kicked back or rebated a part of the premium charged to borrowers' accounts to HSBC allowing HSBC to charge the borrower for more than the cost of insuring the property.

63. From time to time over the years, Lakisha Griffin would receive a statement with some line item transactions that appeared to indicate HSBC had assessed additional charges for force placed insurance against her account. On several occasions when this occurred, either she would call HSBC or have her attorney call HSBC to question the force placed insurance transactions since she had insurance of her choice in effect. Each time, HSBC would deny force placing insurance or charging her for force placed insurance. Sometimes, HSBC would say it was an error. Other times, HSBC would say they would never force place insurance or they did not know she had insurance. Lakisha Griffin and her attorney repeatedly provided proof of the insurance she had purchased. HSBC repeatedly assured Lakisha Griffin, and at times her attorney, that she did not owe anything for insurance and that she could disregard these charges. Later, a force placed insurance charge would show up on her statement again. Lakisha Griffin would take it to her attorney who would call for her again and ask HSBC why they were force placing insurance on her again when she already had insurance. HSBC would say it was a

mistake, and they had fixed it.

64. In reality, over the seven and a half years HSBC serviced Lakisha Griffin's loan account, HSBC charged over $13,500 in force placed insurance against her account. During those same seven and a half years, HSBC refunded partial premiums for force placed insurance only twice (once in the amount of $146.00 and once in the amount of $102.00) despite the numerous times Lakisha Griffin and/or her insurance agency notified HSBC that she had insurance in place and the numerous times Lakisha Griffin and her attorney complained to HSBC about force placed insurance and were assured she owed nothing for insurance and any mistaken force placed insurance charges had been corrected.

65. On or about February 19, 2013, Lakisha Griffin's hazard insurer sent her a notice of non-renewal stating that when her policy expired on April 30, 2013, it would not be renewed because the company was no longer writing that type of insurance in Mississippi. The notice stated it was being sent over two months before her policy expired to give her time to get replacement coverage from another insurer.

66. On or about March 27, 2013, Lakisha Griffin obtained IDS policy no. H101734978 providing $232,000 in hazard insurance coverage and naming HSBC Mortgage Services as mortgagee.

67. In mid April of 2013, Lakisha Griffin received a statement from HSBC dated 4/13/13 with a large number of transactions dated March 18 through 28, 2013 appearing to charge her account for force placed hazard and flood insurance effective as of March 13, 20, and 27, 2013.

68. On April 27, 2013, Lakisha Griffin's home was destroyed by fire.

69. On April 27, 2013, the hazard insurance purchased by Lakisha Griffin from Truck Insurance Exchange covering April 30, 2012 to April 30, 2013 was still in effect.

70. On April 27, 2013, the replacement hazard insurance procured by Lakisha Griffin from IDS Insurance Company on March 27, 2013 was also in effect as it became effective on March 27, 2013 and covered the period from March 27, 2013 to March 27, 2014.

71. HSBC's April 2013 statement for Lakisha Griffin's loan account shows transactions totaling more than $2450.00 for force placed hazard insurance with effective dates in March 2013. The total amount on the April 2013 statement for force placed hazard insurance is approximately the amount charged to her account in earlier years for 12 months of force placed hazard insurance. The information on this statement combined with the earlier notice of nonrenewal led Lakisha Griffin to believe that HSBC had force placed hazard insurance on her property in March of 2013, as it had in the past, that would have been in effect in April of 2013 when the fire occurred.

72. After the fire, Lakisha Griffin called HSBC and informed them of the fire and asked them about force placed insurance. In the process of this call, she was informed that HSBC had charged forced placed flood insurance to her account in most years and had charged forced placed hazard insurance to her account for at least two years. When she sent HSBC proof she had obtained and paid for her own flood and hazard insurance for years, the people she was talking to at HSBC changed their tune, saying that no, they had not force placed any insurance on her property or charged any force-placed insurance to her account.

73. After the fire, Lakisha Griffin timely filed claims with the two insurance companies for the policies she had obtained.

74. Lakisha Griffin also filed a claim with HSBC and/or its forced placement insurer for the fire based on the charges on her March 2013 statement for force placed hazard insurance. Coverage was denied. HSBC has claimed no force placed hazard insurance policy covering her

property on April 27, 2013 exists despite the charges appearing on the April 2013 statement for her loan account.

75. HSBC's denial of the existence of the force placed insurance despite the amounts appearing on Lakisha Griffin's April 2013 statement for force placed hazard and flood insurance led her to question HSBC actions in charging items to her loan account and applying payments she made. She took her recent statements mentioning force placed insurance charges to a lawyer who called HSBC on her behalf. He was assured that Lakisha Griffin's account had not been charged for any force placed insurance, that she did not owe anything for force placed insurance, and that HSBC had corrected any mistaken insurance charges that had been assessed against the account. Nevertheless, Lakisha and her attorney made several requests in phone calls with HSBC for a complete loan history and a complete history of force placed insurance on the account.

76. Following the April 27, 2013 fire, Lakisha Griffin understandably had difficulty in continuing to make her mortgage payments.

77. In July 2013, she received a letter from Mortgage Servicing Specialist Sherrett Brown HSBC Mortgage Services, Inc. dated July 16, 2013 giving notice her loan was in default because HSBC had not received the monthly mortgage payments which came due after the fire. This letter did not provide an itemization of all past due amounts causing the loan to be in default. It stated that principal and interest payments totaling $4245.66 and unitemized ancillary fees totaling $2359.17 plus any regular monthly payments coming due before August 31, 2013 had to be paid in full by August 31, 2013 to cure the default and bring her loan back to current status. It stated no Taxes and Insurance or Late Fees were past due or causing the loan to be in default. The letter did not itemize the $2359.17 in Ancillary Fees, but said the amount "could include

advances for delinquent property taxes, lender placed insurance, and homeowner's association fees" even though the letter had already said no taxes, insurance or late fees had caused the loan to be in default. It said HSBC was committed to working with borrowers experiencing financial difficulties but then contradicted itself saying only full payment of these amounts by August 31, 2013 would be accepted. It informed her that if full payment of these amounts was not made within 45 days, the entire unpaid balance would be accelerated and foreclosure proceedings could be begun to sell the property. It did not inform Lakisha Griffin that she might have options other than paying the full amounts listed in the letter by August 31, 2013 or the availability of counselors outside HSBC to advise her. It also failed to provide her with information to contact the consumer complaint section of the Mississippi Department of Banking and Consumer Finance. Another letter dated two days later from Sherrett Brown at HSBC again stated HSBC was committed to working with borrowers experiencing financial difficulties, and that Sherrett Brown would provide assistance in navigating through the best solution for Lakisha Griffin's circumstances.[1]

78. Less than a month later HSBC sent Lakisha Griffin a statement saying as of September 1, 2013, the principal and interest due would be $1,415.22, the standard payment due would be $2,201.61, the past due amount would be $8,806.44, and the total payment due would be $11,008.05. These amounts were at odds with the amounts in the July 16, 2013 letter. Furthermore, despite repeated phone requests, HSBC had still not sent the requested full loan history or history of force placed insurance for the account.

79. Meanwhile, HSBC sent Lakisha Griffin a letter dated August 1, 2013, informing her

---

[1] . Lakisha Griffin received a nearly identical letter from Sherrett Brown of HSBC dated November 21, 2012 which also failed to itemize $3,486.68 in Ancillary Fees and also said she owed nothing for taxes or insurance.

that the servicing of her loan was being transferred to Caliber Home Loans effective August 31, 2013. The letter noted that if the borrower wished to retain any optional insurance products such as credit life or disability insurance, the borrower would have to make arrangements directly with the insurance company. It did not even mention force placed insurance. Lakisha received this letter on or about August 14, 2013.

80. Around the time she received the August 2013 monthly statement, Lakisha made arrangements to make a payment of $2000.00 on August 29, 2013 by way of a direct debit to her account at the Bank of Lake Village.

81. In August of 2013, Lakisha Griffin received a notice from American Security Insurance Company in Atlanta, Georgia dated August 16, 2013. The notice was titled Lender-Placed Insurance Confirmation of Cancellation, and informed Lakisha Griffin that HSBC had requested cancellation of lender placed insurance effective at 12:01 a.m. on August 31, 2013 because Lakisha Griffin's loan had been transferred to another company and HSBC no longer had an insurable interest in her property. The letter did not say what kind of lender placed insurance was being canceled. It did not say what the premium was or how much was to be refunded. It appears from later analysis of several loan histories that only $146.00 was refunded in connection with this cancellation. This notice was the first indication Lakisha Griffin had that HSBC had misrepresented the facts in April or May 2013 when its representative informed her and/or her lawyer that 1) it had not force-placed insurance on her property, 2) it would never force place insurance on her property, and 3) it had corrected any errors that might have occurred on her account concerning force-placed insurance. Obviously, HSBC had force placed insurance in effect in April and May of 2013 on Lakisha Griffin's property when it told her it had not put force placed insurance on her property and it would not do so. The letter also suggested that

HSBC had not corrected the force placed insurance errors related to her account.

82. On or about August 28, 2013, apparently in response to the repeated requests of Lakisha Griffin and her attorney for a complete loan history and a complete history of force placed insurance on her account, HSBC sent Lakisha a letter with the Subject line "LOAN RESEARCH" which said:

> This letter confirms that HSBC MORTGAGE SERVICES received your inquiry regarding the above referenced loan.
>
> In keeping with our commitment to resolve customer issues in a timely and fair manner, every effort will be made to research and respond to the issues outlined in your inquiry.
>
> We appreciate the opportunity to respond to your inquiry. You may anticipate a response directly from this office.
>
> If you have questions, please contact us at 1-800-333-7023 during normal business hours.

However, contrary to the statements in the letter, neither Lakisha nor her attorney received the information they had requested from HSBC.

83. After initiating a force placed insurance cancellation in mid August of 2013 because it was supposedly transferring the loan to another servicer effective August 31, 2013, HSBC Mortgage Services sent Lakisha Griffin a letter on September 3, 2013 stating:

> Our records indicate that your property is in a Special Flood Hazard Area as designated by the Federal Emergency Management Agency (FEMA). As of this date, we have not received a new or renewal flood policy covering your property. It appears that you do not have flood insurance as of the expiration date shown above.[2] ... If you do not provide us with proof of coverage within 60 days, we will obtain one year's coverage on your property. The full year premium is shown above as Total Premium. Your monthly mortgage payment will be increased to include the cost of this coverage. ... Any coverage we purchase on your behalf may be canceled at any time by providing us proof of other acceptable insurance. If a lapse or gap between the expiration date of your prior policy and the effective

---

2 . The expiration date at the top of the letter was August 31, 2013, the date of cancellation of the force placed insurance.

> date of your new policy exists, your account will be charged an earned premium
> for the time the coverage we placed was in force. Any unused premium will be
> refunded to your mortgage account.

This letter made no sense as HSBC was supposedly no longer servicing her loan, no

longer had an insurable interest in the property, and had been the one to cancel the policy

it referred to as expiring effective August 31, 2013.

84. After Lakisha Griffin received the August 2013 correspondence from HSBC

concerning force placed insurance and HSBC's letter stating that it would be responding to her

requests for a complete loan history and detailed information on all force placed insurance

activity on her account but did not receive the promised information, on September 16, 2013, her

attorney sent a qualified written request to the HSBC office in Brandon Florida which said it

would be handling the requests for information on Lakisha's account. The request specifically

asked for a complete copy of the loan history, copies of all force placed insurance policies on the

property including both casualty and flood policies, a list of each and every occurrence of HSBC

force placing any type of insurance on Lakisha's property, and the dates of each time when force

placed insurance on Lakisha's property were canceled.

85. On September 24, 2013, Lakisha Griffin sent a handwritten letter to both HSBC and

Caliber including both the HSBC and Caliber account numbers and the address of the property.

She asked for a printout of her loan history with HSBC Mortgage Services and stated she was

trying to figure out if her house taxes and insurance had been paid and whether she needed to pay

them herself.

86. On or about October 1, 2013, HSBC sent Lakisha Griffin another form letter

identical to the earlier one dated August 28, 2013 from HSBC's Brandon, Florida office saying it

would research the issues outlined in her inquiry and she could anticipate receiving a response

directly from that office.

87. On or about October 18, 2013 Caliber sent Lakisha Griffin a letter purportedly replying to her written request for a loan history during the period HSBC serviced the loan. Enclosed with that letter, Caliber sent a one page history of the loan since Caliber had assumed servicing the loan, but did not provide any history for the period when HSBC serviced the loan.

88. On or about October 24, 2013, Lakisha Griffin's attorney contacted Caliber by phone following up on Caliber's response to the request for a loan history during the period in which HSBC serviced the loan. Caliber informed him that it only had loan history information since it began servicing the loan and did not have the loan history records from the period when HSBC serviced the loan. He again requested that Caliber obtain the records for the loan history and the history of force placed insurance for the loan. Caliber informed him that it had ordered the history from HSBC.

89. On October 25, 2013, Lakisha Griffin's attorney followed up on the written request to HSBC with a phone call to HSBC's legal department. In this phone conversation, HSBC claimed it was unable to provide a payment history for Lakisha Griffin's loan.

90. On October 29, 2013, Lakisha Griffin's attorney wrote HSBC's Brandon, Florida office again requesting a complete loan history and all documentation concerning the placement of force placed insurance on her property. This time he enclosed a notarized authorization by Lakisha Griffin authorizing the release of records concerning her accounts to her attorney.

91. On or about November 1, 2013, October 18, 2013 Caliber sent Lakisha Griffin another letter virtually identical to its October 18, 2013 letter purportedly replying to her written request for a loan history during the period HSBC serviced the loan. Enclosed with that letter,

Caliber again sent a one page history of the loan since Caliber had assumed servicing the loan, but did not provide any history for the period when HSBC serviced the loan.

92. In followup phone calls, Caliber continued to inform Lakisha Griffin and/or her attorney that it had not received the loan history from HSBC for the period when HSBC serviced the loan.

93. In mid November of 2013, Lakisha Griffin received a monthly mortgage statement from Caliber Home Loans. It stated the total amount due on her loan as of December 1, 2013 was $15,803.01 composed of the current 12/01/2013 payment of $1421.15 in principal and interest, one past due payment of $1421.15 and unpaid advances and fees totaling $12,960.71. There was no indication of what caused the nearly $13,000 in unpaid advances and fees.

94. On November 19, 2013, Lakisha Griffin's attorney sent yet another written request by both fax and certified mail to HSBC enclosing Lakisha's notarized release requesting the following:

    a.  a complete copy of Lakisha Griffin's loan history;

    b.  a copy of all insurance, both Homeowners and Flood insurance, for each and every occurrence when HSBC force placed insurance on the property located at 1725 McClain Street, Greenville; and

    c.  the dates on which any force placed insurance on 1725 McClain Street, Greenville was canceled.

95. In the fax, Lakisha Griffin's attorney reminded HSBC that repeated requests had been made for this information, and informed HSBC that if it did not respond immediately with the requested information, legal action would be pursued for violations of federal laws.

96. On November 22, 2013, HSBC Mortgage Services Workflow Coordinator, Pamela

Borrello, responded stating the items it was attaching constituted "all available requested documents" related to the request. The response was far from complete. The information it provided on the loan history was grossly incomplete often providing no description for items listed in a "fee" column. It did not provide any insurance policies, declaration pages, policy numbers or any dates for cancellation of force placed insurance.

97. On December 2, 2013, Lakisha Griffin's attorney followed up with a fax to Pamela Borrello at HSBC who signed the November 22, 2013 letter. He sent her a copy of the April 2013 statement with all the force-placed insurance detail entries and asked her to call him.

98. On December 6, 2013, Lakisha Griffin's attorney spoke with Pamela Borrello of HSBC again by phone. This time she told him she did not have the information available to determine the status of the force-placed insurance, that she had forwarded the matter to another department and was awaiting an answer, and that he should call back the middle of the next week.

99. On December 10, 2013, Lakisha Griffin's attorney again placed a followup call to HSBC. This time he spoke with a clerk in HSBC's Customer Resolution Department named Victoria Ortiz who claimed HSBC did not have Lakisha Griffin's loan records because the loan had been sold to Caliber. Ms. Ortiz confirmed with her supervisor that it was HSBC's position that they could not respond to the request because the loan had been sold. She stated that she would have a letter faxed to Lakisha Griffin's attorney stating this position in writing.

100. On December 10, 2013, Lakisha Griffin's attorney received a fax from Victoria Ortiz of HSBC enclosing a letter from HSBC Mortgage Service's Vice President for Customer Relations Department acknowledged receipt of a qualified written request from Lakisha Griffin's attorney which she claimed was not received until December 3, 2013. She declined to respond to

the request on the grounds that effective August 31, 2013 servicing of Lakisha Griffin's loan had been transferred to Caliber Home Loans and provided an address and phone number for Caliber.

101. Shortly thereafter, Lakisha Griffin received another form letter dated December 11, 2013 from HSBC's Brandon, Florida office identical to the earlier ones dated August 28, 2013 and October 1, 2013 saying it would research the issues outlined in her inquiry and she could anticipate receiving a response directly from that office.

102. On or about January 10, 2014, Lakisha Griffin's attorney received a letter from Caliber stating that on December 6, 2013 it had received, and was responding to, a qualified written request addressed to the loan's previous servicer requesting a complete loan history and copies of all force placed insurance on the property. This letter stated that the previous servicer was "Household Finance, Inc. ("HSBC")." It enclosed a 20 page payment history for the loan during the period serviced by the previous servicer and stating that it reflected the dates and amounts for lender placed insurance assessed to the loan by the previous servicer.

103. While the document received from Caliber was incomplete, it did provide reason to believe HSBC had made misrepresentations regarding its activities in regard to force placed insurance in connection with Lakisha Griffin's loan account. It also suggested that HSBC may have misapplied portions of Lakisha Griffin's payments to improperly force placed insurance instead of to her loan payments.

104. In response, Lakisha Griffin's attorney wrote to Caliber requesting clarification in regard to lender force-placed insurance in the loan history which HSBC had assessed but then continually denied.

105. Around the same time, Lakisha Griffin received yet another form letter dated January 24, 2013 from HSBC's Brandon, Florida office identical to the earlier ones dated August

28, 2013, October 1, 2013, and December 11, 2013 saying it would research the issues outlined in her inquiry and she could anticipate receiving a response directly from that office.

106. Lakisha Griffin also received a letter dated January 30, 2013 from Caliber acknowledging "receipt of your correspondence dated January 13, 2014." The letter stated that in "accordance with Section 6 of the Real Estate Settlement Procedures Act," it would perform the necessary research and respond within the time period required by law."

107. On or about February 19, 2014, Caliber responded to Lakisha Griffin's attorney's request for clarification. Caliber indicated that it could not "provide a response for the actions or inactions of the prior servicer as we are not affiliated to them." The letter also stated:

> Pursuant to your request, Caliber has submitted a request to the previous servicer for clarification and review of any Lender Placed Insurance assessed to the loan while being serviced by the previous servicer. Once we are in receipt of this information, Caliber will provide a response under separate cover.

108. Shortly thereafter, Lakisha Griffin's attorney received a letter from HSBC's Manager of Customer Disputes purportedly responding to "your recent inquiry HSBC Mortgage Services, Inc. (HSBC) received on February 7, 2014 ... ." The language of the letter indicates that it is in fact a response to Lakisha Griffin's attorney's letter of September 16, 2013. The letter did include a list of dates on which HSBC had charged Lakisha Griffin's account for lender placed insurance and the type of insurance associated with each charge. It also listed the dates of two insurance related small credits to the account. HSBC also enclosed a payment history which contained more columns than the previous history, but contained very little additional description or information. The response still provided far less information about the lender placed insurance than had been requested. It was still contained little to no information about which policies HSBC had canceled and when and did not explain which insurance charges Ms. Griffin's payments were supposedly being used to pay when parts of her payments were applied to the fee

balance.

109. Many hours of forensic analysis of the multiple incomplete loan histories finally produced by HSBC and Caliber eventually revealed that over the years,

a. HSBC had charged over $13,500 against Lakisha Griffin's account for force-placed insurance;

b. HSBC had applied approximately $4,477 of Lakisha Griffin's loan payments to assessments for force placed hazard insurance for years when it knew she had her own hazard insurance in place naming HSBC as mortgagee;

c. HSBC had applied thousands of dollars from Lakisha Griffin's loan payments to assessments for force placed flood insurance for years when it knew she had her own flood insurance in place naming HSBC as mortgagee;

d. HSBC had made only two very small refunds or corrections in regard to force-placed insurance over the seven and a half years it serviced the loan despite the repeated complaints of Lakisha Griffin and her attorney and assurances from HSBC that wrongful charges for force-placed insurance had been or would be corrected;

e. HSBC failed to hold funds received from insurance companies on loss claims in a separate escrow account and misapplied the funds as a result of commingling payment funds with loss claim funds;

f. HSBC had an accounting practice of leaving amounts of money in the "unapplied balance" column instead of applying those amounts to loan payments, legitimate fees and/or deferred interest. At times it left amounts large enough to cover full monthly payments of principal and interest hanging in the unapplied balance column for over a month. This had the effect of making Lakisha Griffin's account appear to be further

behind or more delinquent than it was. It also had the effect of making the balance figures on the statements completely untrustworthy without adequate detail to check them against and made it extremely difficult to determine how HSBC was applying Lakisha Griffin's payments or whether HSBC was applying her payments correctly or erroneously. It also made it impossible for Lakisha to determine if she was being charged for forced placed insurance or whether HSBC was correcting errors and wrongful insurance charges when she brought them to HSBC's attention.

110. In September of 2013, HSBC Mortgage Services, Inc. transferred the loan to Caliber Home Loans using the MERS system. Although the exact amount remains unclear and will likely take an expert forensic accountant to figure out, by the time HSBC transferred the loan to Caliber, its practices had resulted in the accumulation of more than $19,000 in unpaid advances for fees assessed against Lakisha Griffin's loan account.

111. In addition to the accumulated fees, HSBC's practices have caused an insurance mess that has prevented Lakisha Griffin from being able to fully collect on the fire loss to her property for approximately a year despite the lengths she went to in order to fulfill her obligation to keep the property insured and to make sure she would have insurance coverage if it were needed.

112. In short, as a result of Defendants' practices, Lakisha Griffin has been deprived of the value of the insurance she bought and paid for and has had payments she made diverted from paying down her loan to expensive force-placed insurance which was worthless..

113. HSBC's practices have also caused the balance due on her loan to be several thousand dollars greater than it would be had HSBC not misapplied thousands of dollars of her payments to illegally force placed insurance.

114. The results of HSBC's practices have also caused Lakisha Griffin to suffer severe emotional distress. The mess created by HSBC's actions and the problems it has created with her own insurers has deprived Lakisha Griffin of the funds needed to repair her home or in the alternative pay off the mortgage and start over elsewhere. Instead of moving on with her life, she and her son have been reduced to living with her mother on the same street where she formerly lived, being reminded every day of the hell HSBC's practices have put them through as they pass by their ruined former home. Lakisha Griffin's blood pressure has risen to the point where her doctor has had to add additional medications. She is depressed by what has happened with the mortgage and insurance to the point where her doctors have had to medicate her. She is also receiving medical treatment for several stress related illnesses as a result of Defendants' conduct.

115. Upon information and belief, the incidents described in this complaint are not isolated but are part of a regular pattern or practice of doing business designed to profit from borrowers who are not well positioned to defend themselves from such practices. The practices are similar, but much worse in degree and effect, to abusive practices involving force placed insurance which have been or are the subject of investigations by state attorneys general and other law suits against HSBC Group defendants and other participants in the force placed insurance industry.

116. Upon information and belief, members of HSBC Group and the insurance defendants were unjustly enriched at the expense of Lakisha Griffin and other borrowers by the force-placed insurance practices described herein coupled with the business arrangements between the HSBC defendants and the insurance defendants.

## COUNT I - BREACH OF CONTRACT

117. All the other allegations of this Complaint are incorporated here as if fully set forth

in this count.

118. The lender and/or loan originator agreed with the borrower that this loan would have an escrow feature for payment of hazard and flood insurance and taxes funded with a portion of the regular monthly mortgage payment that would result in the timely payment of property taxes and borrower selected hazard and flood insurance. The lender and/or loan originator and/or settlement agent breached a contract by improperly preparing and delivering to the borrower a package of closing documents riddled with errors, inconsistencies, forms with unfilled blanks and forms which should not have been included in the closing for this loan such that the closing package did not reflect the agreement of the parties. For example, the mortgage deed contained provisions for escrow of funds for taxes and insurance and the good faith estimate form reflected escrow for taxes and insurance as agreed, but the package also included an escrow waiver form which should not have been present for this loan.

119. The lender and/or loan originator and/or settlement agent had a practice of inducing and requiring borrowers, including Lakisha Griffin, to sign many forms before the blanks were filled out, before the lender signed any of the forms, without a reasonable opportunity to review the final documents, and without being allowed to make corrections. The instructions emphatically insisted the borrower must sign all forms in the package, could not alter any document under any circumstances, and must return all forms signed within 24 hours or less or the loan would not be funded. The document package presented for execution in these circumstances did not advise borrowers that it was illegal to require borrowers to execute mortgage related documents with substantive blanks not filled out.

120. Borrowers on these subprime debt consolidation loans, including Lakisha Griffin, had little or no bargaining power; had no idea of the level of sophistication and business

knowledge behind the business practices of the debt consolidation and subprime mortgage lending industry; lacked a similar level of knowledge on such transactions as possessed by the lender side of the industry; rarely had an education level sufficient to understand all the complex documents in the closing package and how one document may affect or change the meaning of provisions in another document even if they were given sufficient time to review the documents; rarely were represented by independent counsel; and generally could not afford independent counsel to aid in understanding the documents or negotiating changes to protect their rights. The practices used in this case in such circumstances violate the covenant of good faith and fair dealing in all contracts and demonstrate procedural unconscionability and a lack of voluntary agreement to many of the terms inserted in the documents by those on the lender side of the transactions without negotiation and voluntary knowing consent by the borrower. Many such terms, especially those waiving rights the borrower would otherwise have are both procedurally and substantively unconscionable and unenforceable under Mississippi law.

121. HSBC Mortgage Services had engaged in many transactions using virtually identical documents and was a full participant and partner with Corestar and CFS Settlements in the joint venture of these subprime debt consolidation mortgage refinancing loans.

122. It was the intent of Corestar, CFS Settlements, the members of HSBC Group providing the funding for the loan, and HSBC Mortgage Services that Lakisha Griffin's loan and mortgage would be assigned to and serviced by HSBC Mortgage Services from the very beginning. HSBC Mortgage Services' agents and/or principals and/or joint venturers either knew or should have known that the borrower, Lakisha Griffin, had specifically requested escrow services for taxes and insurance and would not have knowingly waived escrow services. That knowledge is imputable to HSBC Mortgage Services.

123. As with so many other blanks in the closing package, however, the notices concerning assignment of servicing to HSBC Mortgage Services did not get filled out with HSBC Mortgage Services' name and contact information. Thus, the loan was not sent directly to HSBC for servicing at the time of closing, and Corestar had an obligation to set up the loan account according to the agreement between the loan originator and Lakisha Griffin which included escrow services for continuation and timely payment of her choice of hazard and flood insurance and timely payment of her taxes.

124. All the lender side participants in the loan/mortgage transaction including Corestar and the HSBC Group defendants breached the contract by failing to set up an escrow account for taxes and insurance at closing and failing to put in place whatever was necessary to trigger renewal of the insurance already in place at closing and to trigger timely payment of taxes or timely notice to the borrower that taxes were due and would not be paid because funds were not available if funds were not available.

125. HSBC and agents it employed for purposes of tracking and placing insurance repeatedly breached the mortgage contract by force placing hazard and flood insurance on the mortgaged property without a reasonable basis to believe Lakisha Griffin had failed to renew or otherwise maintain insurance on the property.

126. HSBC and agents it employed for purposes of tracking insurance also breached the mortgage contract by force placing hazard and flood insurance on the mortgaged property when HSBC knew or should have known the borrower had hazard or flood insurance in place.

127. HSBC and agents it employed for purposes of tracking and placing insurance breached the mortgage contract by force placing hazard and flood insurance on the mortgaged property when hazard and flood insurance was in place, force placing new policies prior to the

expiration of existing coverage and/or charging force placed insurance against the loan account more often than once a year for annual policies.

128. HSBC and agents it employed for purposes of tracking and placing insurance breached the mortgage contract by placing insurance with an insurance carrier other than the ones chosen by Lakisha Griffin.

129. HSBC and agents it employed for purposes of tracking insurance breached the mortgage contract by failing to cancel force-placed insurance and credit the loan account for premiums charged upon receiving information negating any possible reasonable basis for believing the borrower had failed to renew or otherwise maintain insurance on the property.

130. HSBC breached the mortgage contract by misapplying payments made by Lakisha Griffin, including but not limited to payments large enough to cover more than one monthly mortgage payment.

131. HSBC breached a contract by failing to give notice to Lakisha Griffin that it was not paying the taxes from escrow when due and by not notifying Lakisha Griffin when it or its agents paid taxes on the property or redeemed the property from tax sales.

132. HSBC breached a contract by accumulating and holding large amounts of money as unapplied funds for more than a reasonable time.

133. Upon information and belief, the amounts HSBC charged to Lakisha Griffin's loan account for force placed insurance exceeded the actual cost of the insurance, being inflated by kickbacks, fees, and incentives paid or provided by the insurance defendants to HSBC for placement of all its force placed insurance. Lakisha Griffin did not agree to such practices and such amounts were not authorized to be charged to her account by the valid terms of the contract she agreed to.

134. HSBC breached the contract by diverting payments which should have been applied to principal and interest to pay improper charges for force placed insurance.

135. HSBC breached the contract by diverting payments which were intended to cover the base amount of taxes to force placed insurance and other fees.

136. These actions are examples, but not an exclusive list of the actions and inactions constituting breach of contract by the various defendants and proximately causing damages to Lakisha Griffin.

**137.** These breaches of contract caused economic damages to Lakisha Griffin, including but not limited to over $13,500 in force placed insurance charges, several thousand dollars in tax penalties and interest, as well as causing her loan to be many months behind on payments. The financial stress caused by these economic damages caused her to miss additional payments and forced her into loan restructuring which caused substantial accumulations in deferred interest, all of which caused additional damage to her credit rating and also caused her to incur attorneys fees and other expenses.

## COUNT II - BREACH OF ESCROW FIDUCIARY DUTIES

138. All the other allegations of this Complaint are incorporated here as if fully set forth in this count.

139. An escrow relationship is a fiduciary relationship.

140. In contracting in the deed of trust to provide escrow services covering property taxes, flood insurance, and hazard insurance, and then not creating the escrow accounts and thereafter engaging in acts or omissions resulting in the property being sold for delinquent taxes and then redeemed and resulting in lapses and/or charges for force placed insurance, the lender and/or loan servicing defendants breached the escrow fiduciary duties, proximately causing

damages to Lakisha Griffin.

141. In failing to segregate and escrow funds received from insurance claims for repair of the property from other funds received in connection with this property and allowing such funds to be applied to mortgage payments and/or advances and fees and/or deferred interest and then reversing those payments in a time and manner as to put the loan far enough into default to force restructuring, HSBC breached escrow fiduciary duties.

142. These breaches of fiduciary duties caused Lakisha Griffin substantial economic damages including but not limited to several thousand dollars in tax penalties and interest, and deprived her of funds needed to cover costs of repairing her property.

## COUNT III - FRAUD OR MISREPRESENTATION

143. All the other allegations of this Complaint are incorporated here as if fully set forth in this count.

144. During the application process for this loan around February of 2006, the loan originator, believed to be Janette Rubino, repeatedly represented to Lakisha Griffin that this loan would include escrow provisions for hazard and flood insurance and taxes. The loan originator knew escrow services for taxes and insurance and the inclusion of funds for taxes and insurance in the monthly mortgage payment was one of the driving forces behind Lakisha Griffin's decision to apply for the loan. It was an essential term to her agreement to the contract. At one or more of the times she made this representation, she either knew or should have known the escrow waiver was part of the closing packet and she did not have knowledge of any action having been taken sufficient to cause the escrow waiver to be removed from the closing package and to truthfully make such a representation. She also knew Lakisha Griffin was relying upon her representations concerning the terms and features of the loan in committing to apply for and

enter into this loan and mortgage transaction. She also knew Lakisha Griffin was not familiar with the subprime lending industry and was applying for this loan from a distance (via Internet, phone, fax, express delivery and other distance communications mediums) without the assistance of someone local to explain each document in the package to her, and that Lakisha Griffin would have very limited opportunity to ask questions about the documents or to question or correct any document containing errors or question any document which should not be present. She knew or should have known the closing packet would be presented to Lakisha Griffin in an all or nothing manner, and if Lakisha Griffin did not sign every document in the package without any alteration, even though the package would include many forms with blanks not filled in, the loan would either not be funded or funding would be delayed.

145. Lakisha Griffin relied upon these misrepresentations in giving up her existing loans and mortgages at a lower interest rate in exchange for an adjustable rate mortgage with a minimum interest rate higher than her existing mortgages.

146. Lakisha Griffin also relied upon these misrepresentations in initially not making her own arrangements to pay for taxes and insurance renewals.

147. On numerous occasions, including but not limited to sometime around May 5, 2010, sometime shortly after April 27, 2013, and sometime around August 19, 2013, when Lakisha Griffin or her attorney called HSBC Customer Care questioning notices or statements referring to force placed insurance, HSBC's agents variously falsely represented

    a. that they had not charged her account for force placed insurance;

    b. that they had not placed force placed insurance on her property;

    c. that any charges for force placed insurance were mistakes and had been corrected;

    d. that HSBC did not know she had insurance in place; and

  e. that HSBC was not trying to hold her liable for and was not asserting that she owed

    any amounts for force placed insurance.

  148. On or about October 20, 2011 and October 16, 2012, HSBC misrepresented to

Lakisha Griffin in letters that it would renew her flood insurance in October and would charge

the premium to her "escrow account." These letters did not state who the insurer was or the

amount of the premium that would be charged to the "escrow account" which HSBC never

created for Lakisha Griffin's tax and insurance expenses  Given that the FEMA flood policy for

which at least a partial premium was paid during the loan closing and which HSBC had notice of

came up for renewal in October of each year, the representations in these  letters were misleading

in suggesting HSBC had established the requested escrow account for insurance and was

renewing the flood policy Lakisha Griffin had in place as she had requested.

  149. HSBC knew the representations about charging flood insurance renewals to the

loan's escrow account were false as it never set up any escrow account for Lakisha Griffin's taxes

and insurance expenses. It knew representations about the status of flood insurance were

material to the loan and would be relied upon by borrowers, particularly Lakisha Griffin, in

making decisions concerning whether they needed to take further action in regard to insuring

their property or in regard to their payments.

  150. In mid to late April of 2013, HSBC sent a statement to Lakisha Griffin which

reflected $1927.09 in charges described as "PMT-FORC PLACED HAZ INS" with an effective

date on or a few days after the March transaction dates. The statement also reflected $2063.46 in

charges described as "PMT-FORC PLACED FLD INS" with an effective date on or a few days

after the March transaction dates.  HSBC knew or should have known that such entries in such

amounts in the transaction detail portion of a single monthly statement would be understood by

borrowers and others as representing charges for newly placed force placed flood and hazard insurance policies going into effect on the dates listed as effective dates and being in effect during the following month of April 2013. It also knew or should have known without additional information clearly indicating that the statement was showing the application of recent payments to old charges or showing old coverage dates, borrowers and others would be mislead into believing that the information on the statement reflected charges for new coverage that would be in effect for claims occurring in April 2013.

151. When Lakisha Griffin's home burned on April 27, 2013, both she and her lawyer, understood the April statement to be representing that HSBC had force placed a newly effective hazard insurance policy on her property in March of 2013. In addition to filing claims under her insurance with Truck Insurance Exchange and IDS Insurance Company/Ameriprise, she tried to file a claim with HSBC's insurance. However, the claim was denied with HSBC insisting it had not force placed any hazard insurance on Lakisha Griffin's property covering April of 2013.

152. Upon information and belief, the representations in Lakisha Griffin's April 2013 mortgage statement concerning charges for force placed hazard insurance were also relied upon to Lakisha Griffin's detriment by her two other insurers at the time her home was destroyed by fire on April 27, 2013 in deciding when and how much of her claim to pay.

153. These misrepresentations were material and were made with knowledge of their falsity or reckless disregard for their truth. The persons making these representations knew or should have known they were false as they had or should have had access to the loan history contradicting their statements. They also knew or should have known Lakisha Griffin had no way of determining the truth or falsity of these representations as she was entirely dependent upon HSBC for information concerning what HSBC had charged to her account when, what

actions had been taken in regard to insurance, and how and when they had applied her payments. They knew or should have known Lakisha Griffin was relying on these representations in continuing to make payments on the loan and in foregoing asking her attorney to take further action in regard to force placed insurance, charges made to her account, and proper application of her payments.

154. These misrepresentations helped to hide the misconduct of HSBC and other defendants and delayed Lakisha Griffin and her attorney in taking formal action against HSBC and other defendants in regard to their wrongful actions concerning force placed insurance, misapplication of payment funds, and violations of various laws and regulations described in this complaint proximately causing both economic and emotional distress damages described elsewhere in this complaint.

### COUNT IV - VIOLATIONS OF RESPA OR OTHER FEDERAL STATUTES OR REGULATIONS ON CONSUMER LENDING

155. All the other allegations of this Complaint are incorporated here as if fully set forth in this count.

156. Documents included in the settlement package acknowledge that the loan is a federally related mortgage loan.

157. HSBC and the other defendants were subject to the provisions of RESPA (12 U.S.C. § 2601 et seq.) in their dealings connected with this federally related mortgage loan.

158. Between April 27, 2013 and April 1, 2014, Lakisha Griffin made several qualified written requests to HSBC pursuant to 12 USCS § 2605(e). These requests were made in writing independently of payments. They were made by the borrower, Lakisha Griffin, or her attorney. The requests included the name and account of the borrower as well as the address of the mortgaged property.

159. On November 19, 2013, the QWR asked for a complete loan history, a list of each and every occurrence where HSBC caused flood or hazard insurance to be force placed on the mortgaged property, copies of all force-placed insurance policies placed during the period HSBC serviced the loan, and dates on which any force placed policies were canceled. HSBC responded on November 22, 2013 with a very limited or no description for the dates and amounts listed on the purported loan history. It did not provide any copies of force-placed insurance policies or even the names of insurers and policy numbers. It also did not provide any information on cancellation of force-placed insurance.

160. On December 10, 2013, HSBC's Vice President for the Customer Resolution Department responded to a December 3, 2013 qualified written request declining to provide any information on the grounds that servicing of Lakisha Griffin's loan had been transferred to Caliber Home Loans effective August 31, 2013 even though the inquiry was in regard to actions of HSBC during the period when it was servicing the account.

161. In response to a third qualified written request on February 7, 2014 seeking detailed information on the loan history and force placed insurance on Lakisha Griffin's account during the period HSBC serviced it, HSBC responded on February 20, 2014 with a slightly different loan history and a list of dates on which it force placed flood or hazard insurance and the amounts of the premiums. While this version of the loan history added columns for interest, principal, principal balance, escrow, escrow balance, late charges assessed, late charges paid, late charge balance, unapplied, unapplied balance, fee, fee balance, deferred interest and deferred interest balance, the overwhelming majority of entries still remained blank in the description column.

162. Eventually, it was possible to determine that at least some of the unexplained entries

do involve force placed insurance by comparison to the loan history information provided by Caliber which came from the information HSBC provided to Caliber. Thus, it is clear that HSBC did not respond to the qualified written requests by providing requested information even though it obviously had more of the detail requested.

163. In violation of 12 USCS § 2605(k)(1)(A), HSBC force placed flood insurance on Lakisha Griffin's property on the following dates for the following charges without a reasonable basis to believe she had failed to maintain flood insurance on the property:

   a. December 27, 2006 - $1559.58

   b. December 27, 2007 - $1762.87

   c. December 24, 2008 - $1445.00

   d. October 12, 2009 - $1445

   e. October 11, 2010 - $1445

   f. October 10, 2011 - $1445

   g. October 10, 2012 - $1445

164. In violation of 12 USCS § 2605(k)(1)(A), HSBC force placed hazard insurance on Lakisha Griffin's property on the following dates for the following charges without a reasonable basis to believe she had failed to maintain hazard insurance on the property:

   a. July 9, 2008 - $2153.00

   b. May 21, 2009 - $2324.00

165. HSBC failed to send the notices required by RESPA statutes and regulations before force placing insurance on Lakisha Griffin's property.

166. HSBC failed to timely cancel and refund premiums charged for force-placed insurance on Lakisha Griffin's property upon receipt of information demonstrating she had flood

and/or hazard insurance in place for the respective time period as required by RESPA statutes and regulations.

167. HSBC also misapplied portions of payments made by Lakisha Griffin to illegally force-placed insurance.

168. HSBC managed to hide much of what it did in regard to diverting payments to force-placed insurance premiums and misapplying or delaying application of payments because of its misrepresentations described elsewhere in this complaint coupled with the lack of explanations and generic terms used on its statements and the limited information it provided when it was finally forced to provide loan histories. Even after it provided loan histories with dates and amounts but very little description, only a painstaking and time consuming comparison to the loan history obtained from a transferee servicer and other documents saved over the years made it possible to figure out some of what HSBC did. Even after such analysis, substantial entries on the loan history remain unexplained and may hide further violations.

169. Upon information and belief, as a result of these violations of the law, approximately $4,477 of Lakisha Griffin's payments were wrongfully diverted from interest and principal payments and wrongfully used by HSBC for hazard insurance premiums which were duplicative and of no value in that she maintained hazard insurance of her choice which actually paid for claims on her property during the applicable years. In addition, upon information and belief, HSBC reaped other benefits and profits from this illegally force-placed insurance.

170. Upon information and belief, as a result of these violations of the law, over $9,000 of Lakisha Griffin's payments were wrongfully diverted from interest and principal payments and wrongfully used by HSBC for flood insurance premiums which were duplicative and of no value in that she maintained FEMA flood insurance which actually paid for claims on her property

during the applicable years. In addition, upon information and belief, HSBC reaped other benefits and profits from this illegally force-placed insurance.

171. Upon information and belief, HSBC engaged in practices related to property taxes which also violated RESPA statutes and regulations which deprived Lakisha Griffin of valuable notices concerning past due or delinquent taxes and which resulted in inflated charges against her account for delinquent taxes.

172. HSBC's actions in the present case show a pattern or practice of noncompliance with RESPA statutes and regulations within just this one loan account. However, its pattern and practice of noncompliance with RESPA statutes and regulations is also evidenced by similar but less damaging conduct across a wide class of plaintiffs in several class actions currently pending in other courts.

173. HSBC's violations of RESPA statutes and regulations as well as its attitudes and manner in which it handled matters in regard to Lakisha Griffin's loan and insurance, especially after the April 27, 2013 fire caused considerable emotional distress to Lakisha Griffin resulting in substantial medical expenses and mental anguish.

174. Accordingly, Lakisha Griffin seeks actual damages, additional statutory damages of $2,000 for pattern or practice violations, costs and reasonable attorneys fees under this count.

## COUNT V - ENGAGING IN UNFAIR AND DECEPTIVE PRACTICES PROHIBTED BY MISSISSIPPI CONSUMER PROTECTION STATUTES FOR LOANS

175. All the other allegations of this Complaint are incorporated here as if fully set forth in this count.

176. In the context of loans secured by Mississippi real estate, Mississippi consumer protection statutes in Title 81 of the Mississippi Code prohibit

a. Making a false promise in order to influence or induce a borrower to use the

defendant's services;

b.  Misrepresenting or concealing from a loan applicant material facts, terms or conditions of a transaction or loan services;

c.  Directly or indirectly employing any scheme, device or artifice to defraud or mislead borrowers;

d.  Failing to truthfully account for monies belonging to the borrower;

e.  Engaging in any transaction, practice, or course of business that is not in good faith, or that operates a fraud upon any person in connection with the making of or purchase or sale of any mortgage loan;

f.  Engaging in any fraudulent residential mortgage underwriting practices, including, but not limited to, making in any manner, any false or deceptive statement or representation;

g.  Inducing, requiring, or otherwise permitting the applicant to sign a security deed, note, or other pertinent financial disclosure documents with any blank spaces to be filled in after it has been signed;

h.  Knowingly withholding, extracting, removing, mutilating, destroying or concealing any books, records, computer records or other information which are required by law to be disclosed;

i.  Failing to make disclosures required by any applicable state or federal law or regulations;

j.  Causing or requiring a borrower to obtain property insurance coverage in an amount exceeding the replacement cost of the collateral improvements

k.  Failing to comply with the mortgage loan servicing transfer, escrow account

administration, or borrower inquiry response requirements of Sections 6 and 10 of RESPA and RESPA regulations;

l. Failing to provide written notice to a borrower upon taking action to place hazard, homeowners, or flood insurance on mortgaged property

m. Placing hazard, homeowners, or flood insurance on mortgaged property when the mortgage lender or servicer has reason to know such insurance is in effect;

n. Failing to provide to the borrower a refund of earned premiums paid by a borrower or charged to the borrower for hazard, homeowners, or flood insurance placed by a mortgage lender or servicer if the borrower provides reasonable proof that the borrower had or has obtained coverage such that the forced placement was or is no longer necessary and the property is insured;

o. Failing to provide notice of default to a borrower at least forty-five (45) days before initiation of any foreclosure containing the following information

    i. An itemization of all past-due amounts causing the loan to be in default;

    ii. An itemization of any other charges that must be paid in order to bring the loan current;

    iii. A statement that the borrower may have options available other than foreclosure and that the borrower may discuss the options with the mortgage lender or servicer, or a counselor approved by the U.S. Department of Housing and Urban Development (HUD);

    iv. The address, telephone number, and other contact information for the mortgage lender or the agent for the mortgage lender who is authorized to attempt to work with the borrower to avoid foreclosure;

   v. The name, address, telephone number, and other contact information for one or more HUD-approved counseling agencies operating to assist borrowers in Mississippi to avoid foreclosure; and

   vi. The address, telephone number, and other contact information for the consumer complaint section of the Mississippi Department of Banking and Consumer Finance;

p. Failing to make all payments from any escrow account held for the borrower for insurance, taxes and other charges with respect to the property in a timely manner so as to ensure that no late penalties are assessed or other negative consequences result regardless of whether the loan is delinquent, unless there are not sufficient funds in the account to cover the payments and the mortgage lender has a reasonable basis to believe that recovery of the funds will not be possible;

q. Failure of the mortgage lender/services to timely make reasonable attempts to comply with a borrower's request for information about the home loan account and to timely respond to any dispute initiated by the borrower about the loan account;

r. Failure of the mortgage lender/service to maintain, until a home loan is paid in full, otherwise satisfied, or sold, records sufficient to respond within ten days to requests for information from the borrower concerning

   i. Whether the account is current or, if the account is not current, an explanation of the default and the date the account went into default;

   ii. The current balance due on the loan, including the principal due, the amount of funds held in a suspense account, the amount of the escrow balance known to the mortgage lender, and whether there are any escrow deficiencies or shortages

known to the mortgage lender;

iii. The identity, address and other relevant information about the current holder, owner or assignee of the loan; and

iv. The telephone number and mailing address of a mortgage lender representative with the information and authority to answer questions and resolve disputes;

s. Failure to provide the following information and/or documents within twenty-five (25) business days of receipt of a written request from the borrower or a statement that the account is or may be in error;

i. A copy of the original note, or if unavailable, an affidavit of the lost note;

ii. A statement that identifies and itemizes all fees and charges assessed under the loan transaction and provides a full payment history identifying in a clear and conspicuous manner all of the debits, credits, application of and disbursement of all payments received from or for the benefit of the borrower, and other activity on the home loan including escrow account activity and suspense account activity, if any.

t. Failure to promptly correct errors relating to the allocation of payments, the statement of account, or the payoff balance;

u. Failure to assess any fee incurred within forty-five (45) days of the date on which the fee was incurred;

v. Failure to explain clearly and conspicuously any fee in a statement mailed to the borrower at the borrower's last-known address within thirty (30) days after assessing a fee;

w. Failure to notify the borrower by mail within ten (10) business days after receipt of a

payment if any payment is not credited or treated as credited,

    i.   of the disposition of the payment,

    ii.   the reason the payment was not credited, or treated as credited to the account, and

    iii.   any actions necessary by the borrower to make the loan current.

177. The actions and omissions of the Defendants, including but not limited to, those described in this complaint fall within these descriptions of bad faith, wrongful practices or practices prohibited against consumers by Title 81 of the Mississippi Code.

178. These unlawful practices of Defendants have proximately caused the economic and non economic damages described elsewhere in this complaint.

**179.** The policy of the Mississippi legislature is that awards of actual damages, plus attorneys fees and awards of punitive damages are necessary to deter such unfair and deceptive or prohibited consumer loan practices.

### COUNT VI - CIVIL CONSPIRACY REGARDING INSURANCE

180. All the other allegations of this Complaint are incorporated here as if fully set forth in this count.

181. Upon information and belief, one or more defendants in the HSBC Group entered into one or more agreements with American Security Insurance and/or Assurant and/or one or more of the Insurance John Does concerning monitoring properties secured by mortgages serviced by HSBC and force placing insurance on such properties for the purpose of maximizing profits by taking unfair and/or illegal advantage of borrowers whose loans were serviced by HSBC.

182. Upon information and belief, these parties agreed to procedures related to the force-placement of insurance on borrower's property which

a. farmed out the insurance monitoring and placement functions of a mortgage servicer to someone on the insurance side of the conspiracy and segregated the insurance monitoring and placement functions from the rest of mortgage servicing so as to distance borrower insurance information possessed by servicer from the party contracting to monitor insurance and force place insurance;

b. authorized placement of force placed insurance on borrowers when HSBC defendants did not have a reasonable basis to believe that a borrower, including Lakisha Griffin, had failed to comply with the mortgage loan contract's requirement to maintain hazard or flood insurance;

c. authorized placement of force placed insurance without complying with legal and regulatory requirements for establishing that HSBC had a reasonable basis for believing that a borrower, including Lakisha Griffin, had failed to comply with the insurance provisions of mortgage contracts

d. authorized placement of force placed insurance without complying with legal and regulatory requirements for notices and reminder notices to borrowers, including Lakisha Griffin;

e. authorized renewal or replacement of force placed insurance on a borrower, including Lakisha Griffin, without complying with legal and regulatory requirements for notice to the borrower;

f. authorized renewal or replacement of force placed insurance on a borrower, including Lakisha Griffin, without complying with legal and regulatory requirements for renewing or replacing force placed insurance

g. authorized force placement of insurance in such a manner as to charge borrowers for

overlapping periods of insurance;

h. did not require compliance with legal and regulatory requirements for prompt canceling force-placed insurance and refund of premiums to the borrower;

i. minimized the possibility of borrowers being able to completely avoid force placed insurance; and

j. minimized the opportunities for or likelihood of borrowers being able to promptly obtain cancellations and refunds of premiums on force placed insurance.

183. Upon information and belief, one aspect of the conspiracy was for the insurance defendants to pay kickbacks in some manner to the HSBC defendants for causing all lender placed insurance on mortgaged property to be directed to the insurance defendants along with the contract for monitoring insurance and placing insurance on behalf of the HSBC defendants.

184. As a result of this combination between one or more HSBC defendants and one or more insurance defendants (Assurant, American Security Insurance, and/or John Doe Insurance Defendants), portions of Lakisha Griffin's mortgage payments, which should have been applied to payments of principal and interest were diverted to paying the conspirators for unnecessary force placed insurance which did not even contribute to paying for the losses which occurred to the mortgage property during the course of Lakisha Griffin's loan.

185. As an additional result of this combination, Lakisha Griffin was forced to pay inflated prices for duplicative force placed insurance in addition to the premiums she was paying for insurance she had procured for the property herself.

186. As a result of this combination, Lakisha Griffin had to go through the emotional trauma of having to repeatedly consult a lawyer and have a lawyer help her try to get HSBC to stop charging her for force placed insurance, to straighten out the mess created in her account by

improperly placed insurance and by the failure to promptly cancel and refund premiums for force placed insurance, and try to get HSBC and its insurer to pay their share for losses to her property under insurance which HSBC's statements appeared to indicate had been force placed on her property. The way she was treated in this process and the difficulties it has caused with her attempts to be properly compensated by insurance for the fire loss to her property on April 27, 2013 have also contributed substantially to her emotional distress which should have been foreseen by HSBC and its conspirators.

187. This conduct is particularly reprehensible because it is mostly hidden from borrowers and will slide by most borrowers who never realize they are being deprived of the very protections which legislatures enacted laws to require to protect vulnerable borrowers who rarely are in a position to recognize how lenders, servicing agents, and insurers specializing in lender-placed insurance are profiting at their expense and who have little or no bargaining power to prevent these entities from exploiting consumers.

**188.** Additionally, the amounts charged at one time are low enough that in most cases borrowers will not be able to protect their rights through litigation because it will not be economically feasible. As a result, it is conduct likely to be repeated to the harm of many consumers and which will require substantial punitive damages to deter repetition in the future.

## COUNT VII - COMMON LAW UNFAIR AND BAD FAITH ACTS

189. All the other allegations of this Complaint are incorporated here as if fully set forth in this count.

190. All contracts contain an implied covenant of good faith and fair dealing in performance and enforcement.

191. The covenant of good faith is breached by conduct which violates standards of

decency, fairness or reasonableness.

192. The conduct of the defendants set forth in this complaint violates standards of decency, fairness or reasonableness, and has caused Lakisha Griffin to suffer both economic and non-economic damages.

193. The outrageous actions and omissions described in this complaint rise above breach of contract or mere negligence to the level of an independent and outrageous tort constituting bad faith.

**194.** This independent tort caused both financial harm and serious emotional distress to Lakisha Griffin, entitling her to extra contractual damages, attorney's fees, damages for emotional distress, and punitive damages.

## COUNT VIII - ACCOUNTING

195. All the other allegations of this Complaint are incorporated here as if fully set forth in this count.

196. The incomplete loan histories which have been produced thus far by HSBC and/or Caliber are so incomplete and riddled with entries lacking any explanation that it is impossible to determine with any certainty how Lakisha Griffin's payments have been applied without the aid of discovery and additional explanations from HSBC and/or Caliber. It is similarly impossible to determine without additional explanation from HSBC and/or Caliber what the true balances of principal, interest, escrow accounts for various purposes, unapplied funds, late charges assessed, late charges paid, late charges remaining unpaid, fee advances for payment of insurance, fee advances for payment of taxes, fees assessed for other purposes, and deferred interest should be on this mortgage account at this time. A detailed accounting is also necessary to make sure the appropriate cancellations, refunds, and credits required to rectify the wrongful conduct described

in this complaint have in fact been made.

197. The difficulties in figuring out the loan accounts are the result of approximately eight years of force placed insurance and misapplication of payment inequities. Since the loan is a 30 year loan and there are many remaining years within which to pay it off, continuing with servicing of the loan without correcting the errors and wrongful entries and cleaning up the loan accounting will only invite further accounting problems in the future. The need for a clean set of accounts cannot be compensated for by damages. There is no adequate remedy at law. Only equity can provide what is needed to straighten out the equities of the situation and put the borrower and the new servicer of the loan on a solid equitable footing from which to continue.

### COUNT X - DECLARATORY JUDGMENT

198. All the other allegations of this Complaint are incorporated here as if fully set forth in this count.

199. The actions of the Defendants have created doubt as to what insurance contracts exist which provide property damage coverage for the April 27, 2013 fire, the amount of liability under each policy providing coverage for the fire, and who is entitled to receive those amounts.

200. For this reason, in the interests of justice and judicial efficiency, AMERIPRISE INSURANCE COMPANY, IDS INSURANCE COMPANY, and TRUCK INSURANCE EXCHANGE should be joined in this action so this court can determine what if any effect Defendants' actions may have on the policies providing coverage for the April 27, 2013 fire, the amount of coverage due on Lakisha Rochelle Griffin's claims under the insurance contracts with these insurers, and to whom the coverage benefits are due.

201. Additionally, upon information and belief, AMERIPRISE INSURANCE COMPANY, IDS INSURANCE COMPANY, and/or TRUCK INSURANCE EXCHANGE are in

possession of personal property belonging to Lakisha Griffin for which they have not paid compensation and/or which is primarily of personal sentimental value. Lakisha Griffin seeks the aid of the court in obtaining return of these items.

### COUNT XI - UNJUST ENRICHMENT

202. All the other allegations of this Complaint are incorporated here as if fully set forth in this count,

203. Upon information and belief, all of the Defendants except AMERIPRISE INSURANCE COMPANY, IDS INSURANCE COMPANY, and TRUCK INSURANCE EXCHANGE, and possibly MERS and CALIBER, benefited financially from their participation in the wrongful actions described in this complaint at the expense of Lakisha Griffin.

204. It would be inequitable to allow them to keep such benefits in the face of the damages these wrongful actions caused Lakisha Griffin.

205. A constructive trust should be imposed on all amounts received by each defendant in connection with this loan so that no defendant profits from inequitable conduct or the exploitation of Lakisha Griffin.

WHEREFORE, Plaintiff, Lakisha Rochelle Griffin demands judgment against Defendants, severally and/or jointly, for the following.

A. Compensatory damages for economic damages incurred by Lakisha Rochelle Griffin as a result of Defendants' actions and omissions in an amount to be determined at trial;

B. Compensatory damages for additional costs incurred by Lakisha Rochelle Griffin as a result of Defendants' actions and omissions in an amount to be determined at trial;

C. Compensatory damages for emotional distress in an amount to be determined at trial;

D. Compensatory damages for economic damages suffered by Lakisha Rochelle Griffin as a result of the April 27, 2013 fire ;

E. Extra contractual damages, attorney's fees, and punitive damages in an amount to be determined at trial;

F.      Declaratory relief as to the insurance coverage available to Lakisha Rochelle Griffin as a result of the April 27, 2013 fire;

G.      A constructive trust imposed on the amounts received by each defendant in connection with the loan with redistribution by the court to put the parties into the position which the accounting shows each should be in and disgorgement of any remaining funds to Lakisha Griffin;

H.      Any other relief to which Plaintiff may justly and properly be entitled, all within an amount within the jurisdiction of this Court

RESPECTFULLY SUBMITTED the 31ST of July, 2014.

Lakisha Rochelle Griffin, Plaintiff
By and Through Her Attorneys
HOLLOWELL LAW FIRM


George F. Hollowell, Jr.

OF COUNSEL:

George F. Hollowell, Jr.
HOLLOWELL LAW FIRM
PO Box 1407
3601 Highway 82 East
Greenville, Mississippi 38702-1407
Phone: 662.378.3138
Fax:    662.378.3420
MSBN: 2559
gfh@hollowelllawfirm.com